FILED

Sep 13 2016, 5:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

William N. Riley
Joseph N. Williams
James A. Piatt
Anne Medlin Lowe
Riley Williams & Piatt, LLC
Indianapolis, Indiana

Lonnie D. Johnson
Pamela J. Hensler
Michael J. Potraffke
Clendening Johnson & Bohrer, P.C.
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Thomas L. Davis
Darren A. Craig
Maggie L. Smith
Frost Brown Todd LLC
Indianapolis, Indiana

Steven J. Moss
Duke Energy Business Services,
LLC
Plainfield, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Bellwether Properties, LLC, <br> *Appellant-Plaintiff*, <br><br> v. <br><br> Duke Energy Indiana, LLC, <br> *Appellee-Defendant*. | September 13, 2016 <br><br> Court of Appeals Case No. <br> 53A04-1511-CT-1880 <br><br> Appeal from the Monroe Circuit Court <br><br> The Honorable E. Michael Hoff, Judge <br><br> Trial Court Cause No. <br> 53C01-1506-CT-1172 |

**Brown, Judge.**

Bellwether Properties, LLC ("Bellwether") appeals the trial court's order granting a motion to dismiss in favor of Duke Energy Indiana, Inc. ("Duke"). Bellwether raises one issue, which we revise and restate as whether the trial court erred in dismissing Bellwether's complaint for inverse condemnation as time-barred. We reverse and remand.[1]

## Facts and Procedural History

The facts as alleged in the complaint follow. On July 19, 1957, Duke's predecessor in interest, Public Services Company of Indiana, obtained a perpetual Electric Pole Line Easement (the "Easement") on land now owned by Bellwether for the installation of overhead electric lines. The Easement, memorialized in an Electric Pole Line Easement which was attached to Bellwether's complaint, states that the Easement is ten feet wide, including five feet on either side of the utility lines, and it provided the owner, currently Duke, with the

> right to construct, operate, patrol, maintain, reconstruct and
> remove electrical line, including necessary poles, wires, anchors,
> guys and fixtures attached thereto, for the transmission of
> electrical energy over, along, or across the following described
> real estate situated in the County of Monroe, and State of
> Indiana, to wit: . . . .

---

[1] We held oral argument on July 11, 2016, in Indianapolis. We commend counsel for their well-prepared advocacy.

Appellant's Appendix at 14.

In 1976, the Indiana Utility Regulatory Commission (the "IURC")
promulgated 170 I.A.C. 4-1-26, adopting standards contained in the 1967
edition of the National Electrical Safety Code ("NESC") to govern the
clearance needed around electrical lines. *See* Burns Indiana Administrative
Rules and Regulations 8-1-2-4-A57 (1976). The IURC adopted newer editions
of the NESC in 1986, 1987, 1990, 1993, and 1998.[2] On November 1, 2002, the
IURC amended 170 I.A.C. 4-1-26 to provide that the 2002 edition of the NESC
will govern practices involving electrical lines:

> (a) In all cases not covered by specific statutes in effect, Part 2,
> "Safety Rules for the Installation and Maintenance of Overhead
> Electric Supply and Communication Lines", and Part 3, "Safety
> Rules for the Installation and Maintenance of Underground
> Electric Supply and Communication Lines", of the 2002 edition
> of the National Electrical Safety Code as approved by the
> American National Standards Institute June 14, 2001, as ANSI
> Standard C2, are prescribed for overhead and underground
> construction practice commenced after the date of promulgation
> of this section.

> (b) The commission incorporates by reference the 2002 National
> Electrical Safety Code. Copies may be obtained from the
> Institute of Electrical and Electronics Engineers, Inc., 445 Hoes
> Lane, Piscataway, New Jersey 08855-1331 or are available for

---

[2] *See* 170 I.A.C. 4-1-26 (1986) (adopting 1984 edition of the NESC); 170 I.A.C. 4-1-26 (1987) (adopting 1987 edition of the NESC); 170 I.A.C. 4-1-26 (1990) (adopting 1990 edition of the NESC); 170 I.A.C. 4-1-26 (1993) (adopting 1993 edition of the NESC); and 170 I.A.C. 4-1-26 (1998) (adopting 1997 edition of the NESC).

copying at the Indiana Utility Regulatory Commission, Indiana Government Center-South, 302 West Washington Street, Room E306, Indianapolis, Indiana 46204.

170 I.A.C. 4-1-26 (2002).

[4] Following the IURC's incorporation of the 2002 NESC, Bellwether desired to expand a structure on its property and contacted Duke about its plans. Duke indicated that Bellwether could not expand according to the plan submitted because the plan would not provide the horizontal strike clearance[3] required by the 2002 NESC, explaining that, due to the type and voltage of the current lines within the Easement, a total horizontal strike clearance of approximately twenty-three feet is required and that 170 I.A.C. 4-1-26 and the 2002 NESC provided Duke with control over the entire twenty-three-feet-wide strip of land in and around the Easement.

[5] On June 30, 2015, Bellwether filed a Class Action Complaint and Jury Trial Demand (the "Complaint") noting that it was bringing its claim pursuant to Ind. Trial Rule 23 individually and on behalf of a class, which it defined, and alleging one count of inverse condemnation. Bellwether specifically alleged that Duke took property for a public purpose without proceeding with a condemnation action under Ind. Code §§ 32-24-1 *et seq.* and without providing just compensation, noting that, "[t]hroughout the State of Indiana, Duke has

---

[3] According to Bellwether's complaint, the term horizontal strike clearance refers to the area surrounding an electrical transmission line that must remain vacant and free of structures.

continued to maintain electrical transmission lines that—when considering the required horizontal strike clearance—violate the express limitations of the easements in place." Appellant's Appendix at 8. On August 21, 2015, Duke filed a motion to dismiss, arguing that Bellwether's complaint fell outside the six-year statute of limitations for inverse condemnation actions. On September 14, 2015, Bellwether filed its opposition to the motion to dismiss, and on October 5, 2015, Duke filed its reply brief in support of its motion to dismiss.

On October 15, 2015, the trial court held a hearing on Duke's motion, and on October 29, 2015, it issued an order granting Duke's motion to dismiss (the "Order") which stated in part:

> [Duke] alleges in defense that [Bellwether's] inverse condemnation action is barred by the six (6) year statute of limitation contained in IC 34-11-2-7(3). The Indiana Supreme Court has decided that the six year limitation for trespass applies to inverse condemnation actions. *Murray v. City of Lawrenceburg*, 925 N.E.2d 728, 733 (Ind. 2010)[.]

> [Duke] maintains that [Bellwether's] inverse condemnation claim action accrued when it could have brought a claim for inverse condemnation, again citing *Murray v. City of Lawrenceburg*. [Duke] maintains that since the [IURC] adopted the revised 2002 version of the National Electric Safety Code in 2002, [Bellwether's] inverse condemnation claim action accrued in 2002, and its filing in 2015 was too late.

> [Bellwether] seeks to apply a discovery rule to the limitation of inverse condemnation actions. [Bellwether] argues that, while citizens are ordinarily charged with knowledge of the law, an exception should exist when the subject of the law is arcane or

limited in application to specialized entities or circumstances (such as utility companies), and therefore outside the notice of ordinary land owners in the conduct of their affairs. [Bellwether] claims it is particularly inequitable to expect and require Indiana landowners to have knowledge of the rules governing the National Electric Safety Code requirements for utility electrical line strike clearances.

However, it is not necessary to prove that a citizen has actual notice of a law. The general rule that ignorance of the law is not an excuse charges citizens with knowledge of the law.

> The first question raised is simply how a legislature must go about advising its citizens of actions that must be taken to avoid a valid rule of law that a mineral interest that has not been used for 20 years will be deemed to be abandoned. The answer to this question is no different from that posed for any legislative enactment affecting substantial rights. Generally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply. In this case, the 2-year grace period included in the Indiana statute forecloses any argument that the statute is invalid because mineral owners may not have had an opportunity to become familiar with its terms. It is well established that persons owning property within a State are charged with knowledge of relevant statutory provisions affecting the control or disposition of such property.

*Texaco, Inc. v. Short*, 454 US. 516, 531-532 (U.S. 1982)

Given the Supreme Court's approval of the two (2) year grace period in the *Texaco, Inc. v. Short* case, the six (6) year limitation period in this case appears to be more than adequate to allow

property owners to learn of the utility regulation. [Bellwether] has not offered any authority to the contrary, or any authority that regulations should be treated differently than statutes.

[Bellwether's] complaint was not filed within six (6) years of the enactment of the regulation that [Bellwether] claims expanded [Duke's] easement. Since the statute of limitations provides a complete defense to [Bellwether's] complaint, [Bellwether's] complaint should be dismissed with prejudice, as any amendment of the complaint pursuant to Trial Rule 12(B) would not change that underlying fact.

*Id.* at 4-5.

## *Discussion*

The issue is whether the trial court erred in dismissing Bellwether's claim. A complaint may not be dismissed under Ind. Trial Rule 12(B)(6) for failure to state a claim upon which relief can be granted unless it appears to a certainty on the face of the complaint that the complaining party is not entitled to any relief. *McQueen v. Fayette Cnty. Sch. Corp.*, 711 N.E.2d 62, 65 (Ind. Ct. App. 1999), *trans. denied*. We view motions to dismiss for failure to state a claim with disfavor because such motions undermine the policy of deciding causes of action on their merits. *Id.* When reviewing a trial court's grant of a motion to dismiss, we view the pleadings in a light most favorable to the nonmoving party, and we draw every reasonable inference in favor of that party. *Id.* We will not affirm a dismissal under Ind. Trial Rule 12(B)(6) unless it is apparent that the facts alleged in the challenged pleading are incapable of supporting relief under any set of circumstances. *Id.*

[8] Inverse condemnation is a process provided by statute that allows individuals to be compensated for the loss of property interests taken for public purposes without use of the eminent domain process. *Sloan v. Town Council of Town of Patoka*, 932 N.E.2d 1259, 1262 (Ind. Ct. App. 2010) (citing Ind. Code § 32-24-1-16). It serves to provide a remedy for a taking of property that would otherwise violate Article 1, Section 21 of the Indiana Constitution, which provides in relevant part that "No person's property shall be taken by law, without just compensation; nor except in case of the State, without such compensation first assessed and tendered." *Id.* "A taking by inverse condemnation includes any substantial interference with private property which destroys or impairs one's free use and enjoyment of the property or one's interest in the property." *Id.* (internal quotation marks omitted). In general, inverse condemnation claims are governed by a six-year statute of limitations period. *Murray v. City of Lawrenceburg*, 925 N.E.2d 728, 733 (Ind. 2010).

[9] Bellwether asserts that, under these circumstances, the trial court should have applied the discovery rule, noting that no Indiana court has expressly analyzed whether the discovery rule applies to inverse condemnation actions. The crux of Bellwether's argument is that the court "erred in conflating two distinct legal concepts: knowledge of the law and the accrual of a cause of action," asserting that although it is charged with knowledge of the law, its claim had not accrued because it did not have knowledge of certain technical facts giving rise to the claim. Appellant's Brief at 17. Specifically, Bellwether argues: "The real question is at what point did [it] learn that a certain state of facts existed giving

rise to a cause of action, i.e., Duke's electric supply lines carried enough voltage to require a larger horizontal clearance than was permitted by the easement?" *Id.* at 14. Bellwether maintains that this question should survive Duke's motion to dismiss. It asserts that "neither the existence of the strike clearance, nor the type and voltage of the utility lines were visible to the naked eye; yet knowledge of both was necessary to realize a cause of action existed." *Id.* at 16 (citing *Fenley Farms, Inc. v. Clark*, 404 N.E.2d 1164, 1171-1172 (Ind. Ct. App. 1980)). Bellwether argues that

> For Bellwether to conclude its property rights had been affected, it would have had to learn that the 2002 NESC expands strike clearances, travel to the office of the Commission in Indianapolis to read and copy the 2002 NESC, and somehow determine the requirements contained therein not only apply to its land, but then determine the voltage levels and types of lines maintained by Duke on the property exceeded the easement.

*Id.* at 17 (footnote omitted).

[10] Bellwether further argues that, even if the discovery rule does not apply to inverse condemnation actions such as at issue here, it should not be charged with knowledge of the 2002 NESC because it "is not a law affecting the control or disposition of property" and rather is a regulation applicable only to electrical public utilities. *Id.* at 20-21. It asserts that "[w]hile Bellwether is charged with knowledge of laws that affect the control or disposition of its land, it should not be charged with the knowledge of the technical requirements placed upon sophisticated public utilities." *Id.* at 21.

[11] Duke observes that almost all applications of the discovery rule in Indiana are in tort cases and that an inverse condemnation action is not a tort, but rather is based upon the constitutional prohibition of the taking of property without just compensation. It argues that even if the discovery rule is found to be applicable to inverse condemnation claims, it did not toll the statute of limitations in this case. Duke asserts that, when the discovery rule applies, the relevant question is not what the claimant knew of the injury, but rather "[w]hat *might he have known*, by the use of the means of information within his reach, with the vigilance which the law requires of him?" Appellee's Brief at 23 (quoting *Millwright v. Romer*, 322 N.W.2d 30, 33 (Iowa 1982)). It argues that citizens are charged with knowledge of the law and that the discovery rule does not excuse a plaintiff's duty to exercise diligence to discover the facts from sources open to investigation. Its position is that, upon adoption by the IURC, the 2002 NESC was capable of ascertainment because it is a public law, which defeats application of the discovery rule, and that, because Bellwether ultimately did discover the needed information, it is proven that indeed such information was capable of ascertainment. Duke posits that Bellwether's argument is basically that "the discovery rule should apply because it was allegedly difficult to discover the specific nuances of the law and regulations adopted in 2002," but that this is not the relevant inquiry. *Id.* at 30. And it asserts that "the threshold for non-discoverability is high—it must have been 'practically impossible' to discover the injury—and the fact that it is simply difficult, technical, or challenging is not enough, especially when what is to be discovered is a public record like an enacted law . . . ." *Id.* at 31 (quoting *Catellus Dev. Corp. v. United*

*States*, 31 Fed. Cl. 399, 407 (1994)). Finally, Duke contends that Bellwether is judicially estopped from taking a position inconsistent with the pleadings, noting that Bellwether sought to bring a class action but, when faced with the motion to dismiss, it "reversed course and attempted to invoke the discovery rule by setting forth a long list of individualized inquiries" which is inapposite to a class action complaint. *Id.* at 33.

[12] In its reply Bellwether argues that to not apply the discovery rule would place an "insurmountable burden" upon Indiana property owners, that the cases cited by Duke involve the enactment of an ordinance or statutory provision, and that the 2002 NESC is neither. Appellant's Reply Brief at 9. It specifically argues that it is not analogous to a zoning ordinance, as claimed by Duke, because although the applicability and effect of a zoning ordinance is immediately apparent, the 2002 NESC "applies based on invisible characteristics of which a property owner is unlikely to have notice unless and until he seeks to make improvements that are restricted by the regulation applying to electrical utilities." *Id.* at 13. Regarding Duke's judicial estoppel claim, Bellwether asserts that the trial court based its Order on its conclusion that the discovery rule was inapplicable, that its arguments accordingly relate to the court's Order, and that Duke's assertion of judicial estoppel is without merit. It also contends that class actions involve some degree of individualized inquiry and that this fact does not make the Complaint inconsistent with later pleadings or its arguments.

"In Indiana, statutes of limitation are favored because they afford security against stale claims and promote the peace and welfare of society." *Runkle v. Runkle*, 916 N.E.2d 184, 191 (Ind. Ct. App. 2009), *trans. denied*. "They are enacted upon the presumption that one having a well-founded claim will not delay in enforcing it." *Id.* "Under Indiana's discovery rule, a cause of action accrues, and the statute of limitation begins to run, when a claimant knows or in exercise of ordinary diligence should have known of the injury." *Id.* (quoting *Pflanz v. Foster*, 888 N.E.2d 756, 759 (Ind. 2008)). The exercise of reasonable diligence means simply that an injured party must act with some promptness where the acts and circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist. *Id.* at 191-192 (citing *Bambi's Roofing, Inc. v. Moriarty*, 859 N.E.2d 347, 356 (Ind. Ct. App. 2006)). "The determination of when a cause of action accrues is generally a question of law." *Id.* at 192 (quoting *Cooper Indus., LLC v. City of South Bend*, 899 N.E.2d 1274, 1280 (Ind. 2009)). "When application of a statute of limitation rests on questions of fact, it is generally an issue for a jury to decide." *Id.*

"The claimant bears the burden of bringing suit against the proper party within the statute of limitations." *Id.* "When the movant asserts the statute of limitations as an affirmative defense and makes a prima facie showing that the action was commenced outside of the statutory period, the nonmovant has the burden of establishing an issue of fact material to a theory that avoids the affirmative defense." *Id.* "For an action to accrue, it is not necessary that the

full extent of the damage be known or even ascertainable, but only that some ascertainable damage has occurred." *Shaum v. McClure*, 902 N.E.2d 853, 857 (Ind. Ct. App. 2009) (quoting *Cooper Indus., LLC*, 899 N.E.2d at 1280), *trans. denied*; *see also Shideler v. Dwyer*, 275 Ind. 270, 282, 417 N.E.2d 281, 289 (1981) ("For a wrongful act to give rise to a cause of action and thus to commence the running of the statute of limitations, it is not necessary that the extent of the damage be known or ascertainable but only that damage has occurred.").

[15] The United States District Court, Southern District of Indiana has observed that "Indiana courts view statutes of limitation favorably, recognizing that while such statutes occasionally work an injustice, they 'rest upon sound policy, and tend to the peace and welfare of society'" and that "[i]t is well within the legislature's prerogative to protect defendants from stale claims by prescribing a reasonable period within which actions must be brought." *Hildebrand v. Hildebrand*, 736 F. Supp. 1512, 1517 (S.D. Ind. 1990) (quoting *Shideler*, 275 Ind. 270, 417 N.E.2d at 291 (quoting *Craven v. Craven*, 181 Ind. 553, 103 N.E. 333, 335 (1913), *reh'g denied*)). It noted that in general "a cause of action accrues 'when resultant damage [is] ascertained or [is] ascertainable by due diligence,'" that, in the tort context, the Indiana Supreme Court has declined to apply the rule to all tort claims, but that it "appears to have left the door open for applying the discovery rule on a case-by-case basis." *Id.* at 1517-1518.

[16] The United States District Court, Northern District of Indiana recently discussed whether to apply the discovery rule to a federal statute and observed that both

the Seventh Circuit and the Supreme Court [have] consistently held that the application of the discovery rule should be judged on a case-by-case analysis. In 1971, the Seventh Circuit held that "[i]n *certain instances*, the critical date [for the statute of limitations] is the point at which the injury becomes apparent." *Cooper v. U.S.*, 442 F.2d 908, 911 (7th Cir. 1971) (emphasis added). Deciding whether a particular case was one of those "certain instances" depended on "[t]he particular policies of the statute of limitations in question, as well as the nature of the wrongful conduct and harm alleged." *Id.* In *Stoleson v. United States*, 629 F.2d 1265 (7th Cir. 1980), the court held that "the applicability of the discovery rule" depends on "the nature of the problems faced by a plaintiff in discovering his injury and its cause." *Id.* at 1269. Thus, the discovery rule applies to a claim "that *could not* have been discovered by the date on which it arose." *Chang v. Baxter Healthcare Corp.*, 599 F.3d 728, 734 (7th Cir. 2010)[, *reh'g denied*, *reh'g en banc denied*, *cert. denied*, 562 U.S. 895, 131 S. Ct. 322 (2010)] (emphasis added).

*Gross v. Max*, 906 F. Supp. 2d 802, 810 (N.D. Ind. 2012).

[17]  Initially, we observe that although inverse condemnation claims sound in constitutional law rather than in tort, such claims are functionally similar to tort claims and indeed are often brought alongside tort actions. *See, e.g.*, *Biddle v. BAA Indianapolis, LLC*, 860 N.E.2d 570, 574 (Ind. 2007) (noting that certain homeowners asserted claims of nuisance, inverse condemnation, and promissory estoppel); *Kerr v. City of South Bend*, 48 N.E.3d 348, 350 (Ind. Ct. App. 2015) ("Raymond Kerr filed a complaint against the City of South Bend alleging that noxious gases from its sewer line had been forced into his home. Kerr alleged that this constituted nuisance, trespass, negligence, and inverse condemnation, resulting in injury to his person and his property.").

[18]    The crux of Duke's argument, which was accepted by the trial court, is summarized by the latin maxim *ignorantia juris non excusat*, or ignorance of the law is no excuse. Duke cites to a number of cases for the proposition that the discovery rule does not apply where the alleged taking occurs by passage of a law. *See* Appellee's Brief at 17-19, 26-28. For instance, it cites to Indiana case law stating that "[p]roperty owners are charged with knowledge of ordinances that affect their property." *Story Bed & Breakfast, LLP v. Brown Cnty. Area Plan Comm'n*, 819 N.E.2d 55, 64 (Ind. 2004); *see also Texaco, Inc. v. Short*, 454 U.S. 516, 531-532, 102 S. Ct. 781, 793 (1982) ("The first question raised is simply how a legislature must go about advising its citizens of actions that must be taken to avoid a valid rule of law that a mineral interest that has not been used for 20 years will be deemed to be abandoned. The answer to this question is no different from that posed for any legislative enactment affecting substantial rights. Generally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply."); *Rose v. City of Riverside*, 827 S.W.2d 737, 738 (Mo. 1992) ("Even if he did not have actual notice, everyone is conclusively presumed to know the law and that presumption applies to municipal ordinances as well. The restrictive nature of the ordinance should have alerted Mr. Hornback that the value of his property was diminished and consequently, more difficult to sell. It was upon passage of the restrictive ordinance that damage was capable of ascertainment.") (internal citation omitted). Also, recognizing that the 2002 NESC is not an ordinance or statute, Duke observes in a footnote:

> While these Indiana cases use the term "ordinances" and our case involves an adopted regulation, this is of no legal significance because Indiana law declares that a regulation has the same force and effect of law as an ordinance. *See Hopkins v. Tipton Cty. Health Dep't*, 769 N.E.2d 604, 608 (Ind. Ct. App. 2002) ("Properly adopted administrative rules and regulations have the force and effect of law."); *Union Twp. Sch. Corp. v. State ex rel. Joyce*, 706 N.E.2d 183, 186 (Ind. Ct. App. 1998) ("regulations have the force and effect of law.")[, *trans. denied*].

Appellee's Brief at 19 n.7.

[19] We find the circumstances of this case distinguishable from those of the cases cited by Duke for a number of reasons. On November 1, 2002, the IURC amended 170 I.A.C. 4-1-26 to incorporate by reference the 2002 NESC. That administrative code provision, a technical utility regulation, provides that the 2002 NESC governs the installation and maintenance of overhead and underground electric supply and communication lines and is silent on having any effect on the property rights of owners who had granted easements to utilities. To the extent that the 2002 NESC addresses granting a utility control of additional land surrounding a utility easement due to horizontal strike clearance requirements, subsection (b) of 170 I.A.C. 4-1-26 instructs that the 2002 NESC could be obtained by writing to the Institute of Electrical and Electronics Engineers, Inc., in Piscataway, New Jersey, or by visiting the IURC's office in Indianapolis. However, it is not disputed that, upon reviewing the 2002 NESC, Bellwether would still have to obtain facts solely in the possession of Duke, including the voltage levels and types of lines on the property, in order to ascertain that the regulation had increased Duke's control

over land owned by Bellwether. Thus, neither 170 I.A.C. 4-1-26, nor the 2002 NESC, placed Bellwether on notice that Duke's control over land surrounding the Easement widened from ten to approximately twenty-three feet due to horizontal strike clearance requirements.

[20] Under Indiana's discovery rule, a cause of action accrues when the claimant, in the exercise of ordinary diligence, should have known of the injury, in which reasonable or ordinary diligence requires that the injured party act where the circumstances would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist. *Runkle*, 916 N.E.2d at 191-192. For an action to accrue, some damage must be known or ascertainable. *Shaum*, 902 N.E.2d at 857. Here, 170 I.A.C. 4-1-26 governs installation and maintenance of utility lines and makes no reference to the property rights of the servient tenant of a utility easement. The 2002 NESC is not widely available for review, and determining that Duke's control over Bellwether's land had expanded required knowledge of facts solely in possession of Duke. In addition, the Easement granted to Duke's predecessor in 1957 makes no mention of being governed by the NESC and, in fact, the NESC was not made applicable to such easements until 1976. We believe that the circumstances here are too attenuated to conclude that the taking[4] was ascertainable by Bellwether, and accordingly we find that the discovery rule tolled the applicable six-year statute of limitations

---

[4] We note that at this stage we are to presume that there was a taking by Duke.

until Duke informed Bellwether of the facts regarding its operations which widened its control over Bellwether's property to twenty-three feet, which occurred within six years of the filing of Bellwether's Complaint.[5]

Duke suggested both in its brief and at oral argument that the Eighth Circuit's opinion in *Illig v. Union Elec. Co.*, 652 F.3d 971 (8th Cir. 2011), is similar to the circumstances here and that accordingly we should affirm the trial court. In that case, Illig's predecessor in interest granted a railroad easement as early as 1872 to the Missouri Pacific Railroad Company ("Missouri Pacific"), and in 1972 Missouri Pacific executed a Wire License Agreement with Union Electric

---

[5] The dissent asserts that the State in this case "provided Bellwether with a 'confined universe of investigation,'" and cites to the Indiana Supreme Court's decision in *Tiplick v. State*, 43 N.E.3d 1259 (Ind. 2015). Slip op. at 26. In *Tiplick*, the Court evaluated a vagueness challenge to a statutory scheme defining the term "synthetic drug," the possession and sale of which is an offense under Ind. Code § 35-48-4-11 and Ind. Code § 35-48-4-10(a), respectively. 43 N.E.3d at 1262-1264. The Court held that the scheme was not unconstitutionally vague, finding that Ind. Code § 35-31.5-2-321 provides the definition of the term "synthetic drug," that Section 321 lists Ind. Code § 25-26-13-4.1 as an additional source of compounds named as synthetic drugs pursuant to emergency powers granted to the Indiana Board of Pharmacy, and that Section 4.1(c) directs persons where to look for those published rules based on Ind. Code § 4-22-2-37.1 *Id.* at 1264. It determined that the scheme was not a "maze," as asserted by Tiplick, "but rather a chain with three links—three discrete statutes which give clear guidance as to how to find everything falling within the definition of 'synthetic drug' under Section 321." *Id.*

We find *Tiplick* distinguishable. In this case we are asked to determine whether the discovery rule applies to Bellwether's inverse condemnation claim, an inquiry based upon known or ascertainable damage, and not whether a statute is void for vagueness. Also, whereas the vagueness claim in *Tiplick* was limited to the examination of three, cross-referenced statutes of the Indiana Code and emergency rules accessible online, in this case the "confined universe of investigation," as titled by the dissent, includes a utility regulation incorporating by reference the 2002 NESC, which, it notes, is made available at the office of the IURC in Indianapolis or at an address in Piscataway, New Jersey, as well as facts within the sole control of Duke. In other words, while the inquiry in *Tiplick* is entirely legal in nature, in addition to Bellwether's review of the 2002 NESC it would have to obtain facts wholly within the control of Duke in order to determine that the horizontal strike clearance had increased, in turn widening Duke's control over Bellwether's property. Moreover, as noted above the original 1957 easement granted by Bellwether's predecessor in interest does not mention the NESC or any provision of the Indiana Administrative Code and instead states unequivocally that the easement is ten feet in width.

Company ("Union") allowing it to install electrical transmission equipment along the railroad line and within the easement. 652 F.3d at 974. In 1992, Missouri Pacific abandoned and discontinued its railroad operations in the area, including over the stretch of Illig's property, and ultimately sold the easement to Gateway Trailnet ("Trailnet") for use as a recreational trail. *Id.* In December 2002, Illig initiated litigation against Union alleging, in part, inverse condemnation, in that once the railroad easement expired and was converted to an easement for a recreational trail Union's presence was unauthorized and that her land was harmed. *Id.* at 975.

[22] The *Illig* court, after first observing that the discovery rule applied,[6] noted that a notice of exemption regarding the conversion to recreational trail use was published in the Federal Register and also that Missouri Pacific published a notice of abandonment "in the "*Watchman–Advocate*, in Clayton, Missouri, [a] newspaper in general circulation in St. Louis County, Missouri [,] where the rail line is located." *Id.* at 978. The court held "that these actions were sufficient to give notice to a reasonable person using reasonable diligence to ascertain that Union no longer had a valid license because it could no longer use the license 'for railroad purposes.'" *Id.* (internal citations and quotations omitted). The court ruled that the claim accrued in March 1992 when the

---

[6] We note that the court in *Illig* expressly held that the discovery rule applies to inverse condemnation claims. 652 F.3d at 976 (citing *Shade v. Mo. Highway & Transp. Comm'n*, 69 S.W.3d 503, 514 (Mo. Ct. App. 2001) ("A cause of action for inverse condemnation accrues once the fact of damage is capable of ascertainment."), *reh'g and/or trans. denied*).

government permitted Missouri Pacific and Trailnet to enter into negotiations by the issuance of a "NITU," which was published in the Federal Register, and that Illig's complaint in December 2002 was time-barred by the applicable ten-year statute of limitations. *Id.* at 978-979.

[23] By contrast, in this case the accrual of Bellwether's claim could not be determined simply by reference to 170 I.A.C. 4-1-26. In fact, such determination could not even be accomplished by referencing the 2002 NESC. Unlike in *Illig*, the action by the IURC was not sufficient to give notice to a reasonable property owner in Bellwether's position using reasonable diligence to ascertain that thirteen additional feet of its property beyond the area originally contemplated by the Easement granted in 1957 was subject to the horizontal strike clearance requirements and was within Duke's control. We therefore find *Illig* distinguishable.

[24] We find that the discovery rule's purpose "to limit the injustice that would arise by requiring a plaintiff to bring his or her claim within the limitation period during which, even with due diligence, he or she could not be aware a cause of action exists" is served by its application to these circumstances. *Rieth-Riley Const. Co., Inc. v. Gibson*, 923 N.E.2d 472, 476 (Ind. Ct. App. 2010). We conclude that the court erred when it ruled that the six-year statute of

limitations on Bellwether's Complaint had expired, and we reverse the court's ruling and remand for further proceedings.[7]

## Conclusion

For the foregoing reasons, we reverse the trial court's Order and remand for proceedings consistent with this opinion.

Reversed and remanded.

Baker, J., concurs.

May, J., dissents with separate opinion.

---

[7] To the extent Duke asserts judicial estoppel, we observe that judicial estoppel prevents a party from asserting a position in a legal proceeding inconsistent with one previously asserted. *Alaska Seaboard Partners Ltd. P'ship v. Hood*, 949 N.E.2d 1247, 1254 (Ind. Ct. App. 2011). The basic principle of judicial estoppel is that, absent a good explanation, a party should not be permitted to gain an advantage by litigating on one theory and then pursuing an incompatible theory in subsequent litigation. *Id.* While a party may properly plead alternative and contradictory theories, he may not repudiate by contrary assertions that which he has averred in his pleadings to be true. *Id.* There must have been a determination of the prior action, or, at least, the allegations or admission must have been acted on by the court in which the pleadings were filed or by the parties claiming the estoppel. *Id.*

Here, there has been no prior litigation in this matter and the proceedings are at the pleadings stage. We cannot say that the doctrine of judicial estoppel applies to these circumstances.

| | |
|---|---|
| Bellwether Properties, LLC, | Court of Appeals Case No. |
| *Appellant-Plaintiff*, | 53A04-1511-CT-1880 |
| v. | |
| Duke Energy Indiana, LLC, | |
| *Appellee-Defendant*. | |

**May, Judge, dissenting.**

The majority determines "neither 170 I.A.C. 4-1-26, nor the 2002 NESC, placed Bellwether on notice that Duke's control over land surrounding the Easement widened from ten to approximately twenty-three feet due to

horizontal strike clearance requirements." (*Slip op*. at 17.) I believe we are required to hold Bellwether did have notice, and I must therefore respectfully dissent.

[28] The majority correctly notes "the accrual of Bellwether's claim could not be determined simply by reference to 170 I.A.C. 4-1-26. In fact, such determination could not even be accomplished by referencing the 2002 NESC." (*Id*.) But in light of recent precedent from our Indiana Supreme Court, I do not believe we can say the IURC regulation did not place Bellwether on notice or that the circumstances are "too attenuated," (*id*.), to permit us to conclude any taking was not ascertainable.

[29] In *Tiplick v. State*, 43 N.E.3d 1259 (Ind. 2015), our Supreme Court addressed whether there was adequate notice[8] of a law that, similarly, was "arcane." (Appellant's App. at 2.) Tiplick was charged with eighteen drug-related counts, including dealing and conspiracy to commit dealing in look-alike substances and dealing, conspiracy to commit dealing, and possession of synthetic drugs. The charging information alleged Tiplick's stores sold a "synthetic drug a/k/a spice." *Tiplick*, 43 N.E.3d at 1261. It did not allege the precise compound, but the probable cause affidavit asserted the packages purchased contained "XLR11

---

[8] The majority finds *Tiplick* distinguishable because the case before us involves application of the discovery rule to Bellwether's inverse condemnation claim, an inquiry based upon known or ascertainable damage, and not whether a statute is void for vagueness. The majority does not explain why that distinction is significant; I don't think it is, as the ultimate question we must resolve in this case is whether and when Bellwether should have had knowledge of a law that affected it. Bellwether must be charged with knowledge of its injury, just as Tiplick was charged with knowledge that he couldn't sell what he sold.

[ (1–(5–flouropentyl)indol–3–yl)–(2,2,3,3–tetramethylcyclopropyl)methanone]."
*Id*.

Tiplick moved to dismiss the charges, claiming, among other things, the statutory definition of "synthetic drug" and the statutes criminalizing "look-alike" substances were void for vagueness. (*Id*. at 1262.) At the time, Ind. Code § 35-31.5-2-321, which defined 'synthetic drug,' listed over sixty specific chemical compounds, and it included eleven sections regarding compounds "structurally derived" from other chemicals. It provided a synthetic drug is "Any compound determined to be a synthetic drug by rule adopted under IC 25–26–13–4.1." Ind. Code § 35-31.5-2-321(9). Ind. Code § 25-26-13-4.1 provided the Pharmacy Board could adopt an emergency rule to declare that a substance is a synthetic drug if the substance was scheduled or emergency scheduled by the United States Drug Enforcement Administration or by another state.

This court agreed with Tiplick that those statutes were void for vagueness because their numerous cross-references, undefined terms, and required monitoring of Indiana statutes and promulgations of the Pharmacy Board could not be understood by an ordinary person. *Tiplick v. State*, 25 N.E.3d 190, 196 (Ind. Ct. App. 2015), *transfer granted, opinion vacated*, 43 N.E.3d 1259 (Ind. 2015). The substance Tiplick allegedly sold and possessed as a synthetic drug was identified in the probable cause affidavit as XLR11. But that drug was not listed as a synthetic drug on the dates Tiplick's alleged crimes occurred, and nothing in the charging information indicated which Pharmacy Board

emergency rule declared XLR11 a synthetic drug. A Pharmacy Board Emergency Rule, LSA Document # 12-493(E), declared XLR11 a synthetic "substance" effective September 15, 2012.

[32] But Ind. Code § 25–26–13–4.1 did not authorize the Pharmacy Board to declare something a "synthetic substance" in an Emergency Rule. Instead, the Emergency Rule permits the declaration of a substance as a "synthetic drug." Therefore, to understand the charges, this court held a person of ordinary intelligence would have to first find the definition of "synthetic drug" in Ind. Code § 35-31.5-2-321, determine the synthetic drug alleged to be illegal is not in the very long list (eighty-one specific compounds, and unnamed compounds "structurally derived from" other compounds), *id*. at 195 n.13, and finally try to determine whether the drug may have been declared a synthetic drug by a Pharmacy Board Emergency Rule, the location of which is not specified in Ind. Code § 25-26-13-4.1. This, we believed, the State could not require a citizen of ordinary intelligence to do.

[33] Our Indiana Supreme Court vacated our decision and affirmed the denial of Tiplick's motion to dismiss, holding the statute did provide notice enabling ordinary people to understand the conduct it prohibits: "Despite its cumbersome length and detail, Section 321 is ultimately just a discrete list of chemical formulas and analogs, supplemented with additional chemicals by Section 4.1's emergency rules." *Tiplick*, 43 N.E.3d at 1262-63. The Court conceded

it may be that a person with ordinary *experience and knowledge* does not know what (1–(5–fluoropentyl)indol–3–yl)–(2,2,3,3– tetramethylcyclopropyl)methanone is made of, but that is not the test; rather, it is whether a person of ordinary *intelligence* would understand his conduct was proscribed. Here, an ordinary Hoosier, armed with this chemical formula for XLR11, could determine through appropriate testing whether he was attempting to sell any products containing it.

*Id*. at 1263 (emphasis in original).

[34]    Our Supreme Court rejected Tiplick's characterization of the scheme as a "statutory maze," *id*., that prevents a person of ordinary intelligence from being able to discover what conduct is proscribed. "This is not a 'maze,' but rather a chain with three links -- three discrete statutes which give clear guidance as to how to find everything falling within the definition of 'synthetic drug' under Section 321." *Id*. at 1264. "[T]he State has provided a . . . confined universe of investigation." *Id*.

[35]    Here, as in *Tiplick*, the State has provided Bellwether with a "confined universe of investigation." *Id*. 170 I.A.C. 4-1-26 explicitly provides the 2002 edition of the NESC will govern practices involving electrical lines. It notes the address from which the NESC may be obtained, and provides it is also available for copying at the Indiana Government Center.

[36]    The majority in the case before us finds it significant that

the accrual of Bellwether's claim could not be determined simply by reference to 170 I.A.C. 4-1-26. In fact, such determination could not even be accomplished by referencing the 2002 NESC.

Unlike in *Illig* [*v. Union Elec. Co.*, 652 F.3d 971 (8th Cir. 2011)], the action by the IURC was not sufficient to give notice to a reasonable property owner in Bellwether's position using reasonable diligence to ascertain that thirteen additional feet of its property beyond the area originally contemplated by the Easement granted in 1957 was subject to the horizontal strike clearance requirements and was within Duke's control.

(*Slip op.* at 20.)

[37] That some of the information might have been within Duke's control is not a basis for reversal. As the majority correctly notes, under Indiana's discovery rule a cause of action accrues, and the statute of limitation begins to run, when a claimant knows *or in exercise of ordinary diligence should have known* of the injury." *Pflanz v. Foster*, 888 N.E.2d 756, 759 (Ind. 2008). Bellwether's easement gave Duke the right to build and maintain electrical lines on the Bellwether property. As explained above, *Tiplick* instructs us that Bellwether was charged with knowledge that IURC regulations govern the clearance needed around electrical lines. The majority points to nothing in the record that reflects the information it characterizes as "wholly within the control of Duke," (slip op. at 18 n.5), such as the voltage levels and types of lines on the property, could not have been obtained by Bellwether through ordinary diligence.

[38] If the "ordinary Hoosier" described in *Tiplick* can be charged with knowledge and understanding of the complex statutory scheme governing synthetic drugs and synthetic substances, then certainly Bellwether must be charged with

knowledge that there were horizontal strike clearance requirements, what the requirements were, and that they applied to the Bellwether easement. I therefore do not believe our recent Indiana Supreme Court precedent permits the majority's conclusion Bellwether could not have ascertained what the applicable rules were and how they would have affected the scope of the easement. I must therefore respectfully dissent.